TRACY S. COMBS (Cal. Bar No. 298664)
CombsT@sec.gov
CASEY R. FRONK (Illinois State Bar No. 6296535)
*PRO HAC VICE* APPLICATION PENDING
FronkC@sec.gov
Counsel for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
351 South West Temple, Suite 6.100
Salt Lake City, UT 84101-1950
Tel.: (801) 524-5796
Fax: (801) 524-3558

Local Counsel:
CHARLES E. CANTER (Cal. Bar. No. 263197)
CanterC@sec.gov
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Tel: (323) 965-3998
Fax: (213) 443-1903

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## Southern Division

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**vs.**<br><br>**TKO FARMS, INC., a private Wyoming corporation; AGRAVITAE, INC., a private Wyoming corporation; KENNETH DEWAYNE OWEN, an individual; REYNALDO AGUILAR (JR.), an individual; JAMES BRIAN BLAYLOCK, an individual; ROSS GREGORY ERSKINE, an individual, and the ESTATE of GILBERT ALLAN PENHOLLOW,**<br>**Defendants,**<br><br>**and**<br><br>**FREELIFE LOGISTICS LLC, a private Wyoming limited liability company; PERSONAL GROUP, LLC, a private Nevada limited** | **Case No. 8:22-cv-00941**<br><br><br>**COMPLAINT** |

**liability company; SIGNATURE ONE CAPITAL INC, a private Nevada corporation; and STORBER, LLC, a private California limited liability company,**

**Relief Defendants**

Plaintiff, Securities and Exchange Commission ("Commission"), alleges as follows:

## SUMMARY OF THE ACTION

1.      This action concerns two unregistered and fraudulent securities offerings perpetrated by Defendant Kenneth DeWayne Owen, a convicted felon, and two entities he controlled, Defendants TKO Farms, Inc. ("TKO Farms") and Agravitae, Inc. ("Agravitae").  Between at least May 2017 and March 2021, both offerings raised nearly $20 million from nearly 200 investors, and purported to provide investors the opportunity to share in profits generated by an exotic hardwood and citrus tree farm located in Belize and its products.

2.      Defendants Owen, TKO Farms, and Agravitae misrepresented and failed to disclose to investors, among other things, that substantial amounts of the monies invested would be used to pay exorbitant commissions to the various unregistered brokers, and that Owen—who controlled TKO Farms' and Agravitae's financial accounts and used investor funds for personal expenses, including his own criminal restitution—was the true control person behind the investment scheme and had a criminal record.

3.      Owen, TKO Farms, and Agravitae effectuated the offering through the use of various unregistered brokers—including Defendants Reynaldo Aguilar Jr., James Brian Blaylock, Ross Gregory Erskine, and Gilbert Allan Penhollow (deceased)—who cold-called and/or solicited numerous individuals in order to

induce them to invest and received transaction-based compensation in return for their solicitations. Relief Defendants Freelife Logistics LLC, Personal Group, LLC, Signature One Capital Inc, and Storber, LLC are entities controlled by the various unregistered broker defendants and received certain of the ill-gotten proceeds of those defendants' unregistered broker activity.

## JURISDICTION AND VENUE

4.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b); 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d); 78u(e)] to enjoin such acts, practices, and courses of business, and to obtain civil money penalties and such other and further relief as this Court may deem just and appropriate.

5.      Defendants were, individually and collectively, involved in the offer and sale of securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], issued by Defendants TKO Farms and/or Agravitae.

6.      Each Defendant, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce in connection with the conduct alleged herein.

7.      This Court has subject matter jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. § 77t(b); 77v(a)]; Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. § 78u(d); 78a(a)]; and 28 U.S.C. § 1331.

8.      Venue in this District is proper because each Defendant is found in, inhabits, and/or transacted business in the Central District of California, and because one or more acts or transactions constituting the violations alleged herein occurred in the Central District of California.

## DEFENDANTS

9. **TKO Farms, Inc.**, is a Wyoming corporation headquartered in Tustin, California.  TKO Farms' ostensible business was to purchase, develop, and operate an exotic hardwood and citrus tree farm in Belize.

10. **Agravitae, Inc.** (f/k/a Gravacor, Inc.; f/k/a Infinity International Health & Beauty, Inc.) is a Wyoming corporation headquartered in Tustin, California.  Agravitae's ostensible business was development and marketing of products utilizing the hardwoods and citrus grown on TKO Farms' Belize farm.

11. **Kenneth Dewayne Owen**, age 57, is last known to be a resident of Laguna Beach, California.  Owen, through multiple nominee/figurehead individuals, exercised undisclosed *de facto* control over TKO Farms and Agravitae and, at all relevant times, controlled those entities' bank accounts.  Owen also direct and indirectly recruited and exercised control over various unlicensed telephone solicitors acting as unregistered brokers, whom he, on behalf of TKO Farms and Agravitae, engaged to solicit investment in securities issued by TKO Farms and/or Agravitae.  Owen has been convicted at least twice of federal criminal offenses in the Central District of California (*United States v. Owen*, Case No. 2:07-cr-1095 and *United States v. Owen*, Case No. 2:09-cr-688), including stealing bulk mailing services from the U.S. Postal Service and conspiracy to commit securities fraud in connection with a stock market manipulation scheme, commonly known as a "pump-and-dump," related to publicly-traded company.  Owen has also been the subject of a Department of Labor consent judgment related to improper use of employee funds, one or more state tax liens, and a voluntary bankruptcy filing.

12. **Reynaldo Aguilar (Jr.) (a/k/a Ted Collins)**, age 62, is last known to be a resident of Mission Viejo, California.  Aguilar was engaged directly and/or

indirectly by Owen to solicit prospective investors to invest in securities issued by TKO Farms and Agravitae.

13. **James Brian Blaylock**, age 55, is last known to be incarcerated at Folsom State Prison in California where he is serving a 13 year sentence arising from a state prosecution for securities-related charges. Blaylock was engaged directly and/or indirectly by Owen to, among other things, solicit prospective investors to invest in securities issued by TKO Farms. Blaylock was the subject of a 2018 desist and refrain order issued by the California Business, Consumer Services and Housing Agency Department of Business Oversight related to his operating as an unlicensed investment adviser.

14. **Ross Gregory Erskine (a/k/a, *inter alia*, John Thompson, Richard Edmonds)**, age 50, is believed to be a resident of Newport Beach, California. Erskine, who was a subject of an enforcement action brought by the Commodity Futures Trading Commission (*see* CFTC Rel. No. 4879-04; Jan. 15, 2004), was engaged directly and/or indirectly by Owen to solicit prospective investors to invest in securities issued by TKO Farms and Agravitae and did so directly and/or through others who worked under him as solicitors. Erskine is presently a defendant in another action brought by the Commission (*SEC v. LFS Funding Limited Partnership, et al.*, Case No. 2:21-cv-04211) pending in the Central District of California as of the date this complaint was filed.

15. **The Estate of Gilbert Allan Penhollow** ("Penhollow Estate") comprises the property in which Gilbert Allan Penhollow had an interest at the time of his death, including real, personal, or other property he owned, possessed, or controlled, whether directly or indirectly. Penhollow passed away on July 21, 2021. Prior to his death, Penhollow was engaged by Owen to solicit prospective investors to invest in securities issued by TKO Farms and Agravitae.

## RELIEF DEFENDANTS

16.    **FreeLife Logistics LLC**, is a private Wyoming limited liability company with no known place of business that is controlled by Blaylock.  FreeLife Logistics received certain ill-gotten proceeds of the misconduct described herein.

17.    **Personal Group, LLC**, is a private Nevada limited liability company with no known place of business that is controlled by Erskine.  Personal Group received certain ill-gotten proceeds through the misconduct described herein.

18.    **Signature One Capital Inc**, is a private Nevada limited liability company with no known place of business that is controlled by Erskine. Signature One Capital received certain ill-gotten proceeds through the misconduct described herein.

19.    **Storber, LLC**, is a private California limited liability company with no known place of business that is controlled by Aguilar. Storber received certain ill-gotten proceeds through the misconduct described herein.

## FACTS

20.    Beginning sometime around May 2017, and continuing into the first quarter of 2021, TKO Farms began offering securities to prospective investors.  In late 2019 or early 2020, Agravitae began to do the same, continuing the offering until at least into August 2021.

21.    In connection with the TKO Farms and Agravitae securities offerings, Owen hired individuals, including Erskine and Penhollow, to solicit prospective investors via telephone cold-calls.  Penhollow, in conjunction with Owen, eventually hired others, including Aguilar, to work as telephone solicitors under him in a newly established telephone call center (*i.e.*, a boiler room) located in a building next door to Owen's offices.  Over time, Owen operated the call center through other managers, including Blaylock.

22.     Those individuals engaged by Owen to work in the call center operated under a model in which "openers" (a) cold-called prospective investors identified from purchased investor lead lists, (b) read to the prospective investors various statements from written scripts, drafted by various individuals but ultimately approved by Owen, pitching the TKO Farms and/or Agravitae investment opportunities, (c) screened prospective investors who responded favorably to the pitch (*i.e.*, asked if the investors had liquid assets available to invest and whether the investors were accredited, among other things), and (d) passed along to "closers" information about those prospective investors who seemed promising.  These closers, including Penhollow, Aguilar, and Blaylock, would then call the prospective investors, answer their questions, provide them with additional information and/or documents, and seek to secure an investment. Those solicitors who did not work in the boiler room, including Erskine, operated in both the "opener" and "closer" roles.

23.     Depending on a prospective investor's eagerness to invest and relative desire for additional information, the telephone solicitors engaged by Owen would decide which offering materials relative to TKO Farms and/or Agravitae to send (or have sent by an administrative assistant) to the prospective investor. For example, eager prospective investors, including those who were being asked to make an additional investment, might be sent only a subscription agreement; while less eager investors might be sent an entire suite of offering documents as described below, receive an invitation to visit the TKO Farms offices in California and/or the farm properties in Belize, and be provided with contact information for other TKO Farms investors.

24.     The TKO Farms and Agravitae offering documents, either complete packages or portions thereof, were distributed to investors in both printed (via U.S. mail or FedEx) or electronic form (via email or download).

25.     In regard to both the TKO Farms and Agravitae securities offerings, no registration statements were in effect, no registration statements were filed with the Commission, and no exemption from registration validly applied.

26.     Although the telephone solicitors orally asked prospective investors if they were "accredited" investors under the federal securities laws, and although the subscription agreements contained check-the-box style investor self-certifications, none of the Defendants are known to have undertaken any reasonable steps to verify, at the time of solicitation, that investors were accredited legally.

27.     The call center openers were typically paid, either directly or indirectly, by a shell company controlled by Penhollow and/or by the applicable issuer (*i.e.*, TKO Farms or Agravitae), a small hourly wage or salary and a commission on investments received from prospective investors the opener had called.  This commission ranged from at least 2.5% to 7% of the total amount invested.  The independent solicitors and the call center closers received commissions ranging from 15% to 40% of the total amount invested.

**Misrepresentations and Omissions**

**in Connection with the TKO Farms Securities Offering**

28.     The TKO Farms securities offering documents provided to investors included, in some instances, (a) a multicolor brochure describing the company and opportunity in general terms, (b) a "Confidential Offering Memorandum" ("COM") that described the offering in detail, (c) a subscription agreement, included as an appendix to the COM, that prospective investors were asked to complete and return, and (d) an "Income Statement Projection," included as an exhibit to the COM, that set forth the company's expected financial performance over the coming years (collectively, the "TKO Farms Offering Documents").

29.     Owen, as the *de facto* control person of TKO Farms, possessed the ultimate authority over the content of the TKO Farms Offering Documents and their distribution, directly and/or indirectly, to prospective investors.

30.     The TKO Farms Offering Documents contained numerous material misstatements and omissions, which TKO Farms and Owen knew or were reckless in not knowing were materially false or misleading, and/or that the offering documents contained material omissions, as follows:

31.     The TKO Farms Offering Documents discussed the purported TKO Farms "management team," and disclosed, at various points, Richard Melland as CEO, Tom Owen as president, and Shinsuke Nakashima as treasurer/secretary. Kenneth Owen was listed as merely "VP of Sales" or "Senior Vice-President of Sales" and was described as a successful businessman.  The documents also stated that the success of the TKO Farms endeavor would depend on "continued employment by us of senior management and key technical personnel, especially our CEO, Richard Melland."  In reality, Messrs. Melland, Tom Owen, and Nakashima were, effectively, mere nominees for Kenneth Owen, who exercised full control over TKO Farms's finances and governance and on whom TKO Farms' success depended.  The brochures also omit the fact that Kenneth Owen was a convicted felon in a prior securities fraud-related federal criminal case and in connection with stealing from the U.S. Postal Service.

32.     The TKO Farms Offering Documents contained tables of the "beneficial ownership of the Company's securities: (i) by the directors and officers of the Company, (ii) by persons who own 5% or more of such securities, and (iii) by the directors and officers as a group."  The TKO Farms Offering Documents also falsely stated that "Management of the Company presently holds a majority of the issued and outstanding Shares in the Company and expects to continue to hold such majority after the Offering…. Due to their stock ownership and positions with

the Company, the current officers will be in a position to continue to control the affairs and management of the Company."  In reality, Messrs. Melland, Tom Owen, and Nakashima did not own or control a majority interest in TKO Farms. None of the iterations of those documents disclosed that Owen controlled the majority of TKO Farms' shares via a holding company, TKO Farms Holdings Inc.

33.   The TKO Farms Offering Documents stated that "[t]he Company may additionally utilize the services of … selected broker-dealers who are members of the Financial Industry Regulatory Authority ('FINRA') in connection with the offer and sale of the [TKO Farms securities], subject to applicable securities laws" and that "[p]art of the proceeds [of the offering] may also be used to pay potential commissions to a FINRA and SEC registered placement agent, as well as other supporting broker-dealers and sales agents, in accordance with federal securities law and the securities law of the various states up to the highest amount permitted by such laws."  In reality, TKO Farms did not utilize the services of any registered broker-dealers, sales agents, or placement agents, including any members of FINRA, and, instead and in contravention of federal securities laws, utilized unregistered brokers and paid them exorbitant commissions, sometimes of up to 40%.

34.   The TKO Farms Offering Documents stated, *inter alia* and at various points (including in certain tables), that the proceeds of the offering would be used "for land acquisition and development, general and administrative costs, reserve capital, repayment of original investments and other general corporate purposes, with broad discretion by the management of the Company."  In reality, Owen—not management—made the decisions regarding the use of funds.  The offering documents also failed to disclose that a significant portion of the proceeds of the offering were used to pay commissions to the telephone solicitors, to make loans to and payments on behalf of Owen's associates and other entities with which Owen

is or was associated (including Agravitae), to pay Owen a six-figure salary (substantially higher than those of disclosed management), and to pay Owen's personal expenses, including but not limited to: (a) $83,746.09 towards restitution that he was ordered to pay in connection with at least one of his criminal convictions to the Clerk of the U.S. District Court for the Central District of California; (b) donations to Owen's church; (c) payments for Owen's residence and homeowners association; (d) expenses related to redevelopment of real estate in Oregon controlled by Owen and loans to Penhollow and others to make down payments on various homes; and (e) payments to various clothing stores, wineries and liquor stores, hotels and restaurants.

35.     Finally, the TKO Farms Offering Documents included income statement projections showing an estimated "Gross Income" of $1,530,000 for 2018.  Upon information and belief, TKO Farms generated negligible revenues during 2018.  These projections concerning 2018 "gross income" were shared with investors after they were known or should have been known by Owen to be inaccurate.

**Fraud in Connection with TKO Farms' Forms D**

36.     In connection with the TKO Farms securities offering, Owen caused TKO Farms to file two Forms D with the Commission on or about June 1, 2017 and June 24, 2019 (respectively herein, the 2017 Form D and the 2019 Form D), that also contained material misstatements and omissions, including the following:

37.     The 2017 Form D lists Richard Melland as CEO and chairman, Tommie Owen as president and director, and Shinsuke Nakashima as treasurer, secretary, and a director of TKO Farms.  The 2017 Form D failed to disclose, as described above, that these individuals were nominees, and that Owen was in fact in control of TKO Farms.

38.     Both the 2017 Form D and the 2019 Form D failed to disclose any amount of compensation that TKO Farms was paying, directly or indirectly, to telephone solicitors as described above.

39.     The 2017 Form D and 2019 Form D both falsely state that the total offering amount was $6 million.  In fact, TKO Farms received at least $7,608,849.99 from investors between May 8, 2017 and June 4, 2019, and at least $6,526,034.70 from investors between June 14, 2019 and February 3, 2021.

40.     TKO Farms and Owen knew or were reckless in not knowing that these and other statements contained in the 2017 Form D and the 2019 Form D filed with the Commission were materially false or misleading, and/or that the 2017 Form D and the 2019 Form D contained material omissions.

**Misrepresentations and Omissions**

**in Connection with the Agravitae Securities Offering**

41.     Akin to the TKO Farms Offering Documents, the Agravitae securities offering documents included (a) a multicolor brochure describing the company and opportunity in general terms, (b) a "Confidential Offering Memorandum" ("COM") that described the offering in detail, (c) a subscription agreement, included as Appendix A to the COM, that those wishing to invest were asked to complete and return, and (d) a multi-year financial projection setting forth the company's expected financial performance over the coming years (collectively, the "Agravitae Offering Documents").

42.     Owen, as the *de facto* control person of Agravitae, possessed the ultimate authority over the content of the Agravitae securities offering documents and their distribution, directly and/or indirectly, to prospective investors.

43.     The Agravitae Offering Documents contained numerous material misstatements and omissions, which Agravitae and Owen knew or were reckless in

not knowing were materially false or misleading, and/or that the offering documents contained material omissions, as follows:

44.     The Agravitae Offering Documents contain no disclosures related to Owen's ownership or control of Agravitae, his ultimate control over the company and its assets (including its bank accounts), or his common control of both Agravitae and TKO Farms.  The Agravitae Offering Documents state that "Agravitae has an exclusive agreement with TKO Farms allowing for infusion of their premium graviola with each of our products" without disclosing that such agreement would not be arms' length.  While the Agravitate Offering Documents state that "[p]otential conflicts of interest may arise in the course of our operations involving any member of management's interest, or an affiliate company's interest, as well as their respective interests in other potential unrelated activities," they do not disclose the actual conflict of interest created by Owen's ownership of TKO Farms.  Further, the Agravitae Offering Documents did not disclose Owen's prior criminal convictions.

45.     The Agravitae Documents stated, *inter alia* and at various points (including in certain tables), that the proceeds of the offering would be used "for product development, processing facilities, infrastructure, general and administrative costs, reserve capital, repayment of original investor funds and other general corporate purposes, with broad discretion by the management of the Company."  In reality, Owen—not management—made the decisions regarding the use of funds and had authority over Agravitae's bank accounts.  Akin to the TKO Farms Offering Documents, the Agravitae Offering Documents also failed to disclose that a significant portion of the proceeds of the offering were used to pay commissions to the telephone solicitors and to pay Owen's personal expenses, including but not limited to: (a) zoning, landscaping, labor/materials and excavation work on a property Owen owned in Oregon; (b) residential property

appraisal services; (c) payments to food and liquor stores, as well as restaurants; (d) personal care services; and (e) payments to or for the benefit of other business entities believed to be controlled by Owen, including but not limited to TKO Farms.

46.     Finally, the Agravitae Offering Documents state that "[p]art of the proceeds [of the offering] may also be used to pay potential commissions to a FINRA and SEC registered placement agent, as well as other supporting broker-dealers and sales agents, in accordance with federal securities law and the securities laws of the various states up to the highest amount permitted by such laws . . . ."  In reality, Agravitae did not utilize the services of any registered broker-dealers, sales agents, or placement agents, and, instead and in contravention of federal securities laws, utilized unregistered brokers and paid them exorbitant commissions, sometimes of up to 30% to 40%.

### Fraud in Connection with Agravitae's Form D

47.     In connection with the Agravitae securities offering, Owen caused Agravitae to file a Form D with the Commission on or about February 8, 2021 (the 2021 Form D).  The 2021 Form D contained material misstatements and omissions concerning the offering, including the following:

48.     The 2021 Form D lists a date of first sale of January 27, 2021.  In fact, Agravitae sold its securities to investors as early as December 2019.

49.     The 2021 Form D discloses no sales compensation that had or would be paid to telephone solicitors, including commission compensation.

50.     The 2021 Form D states a total offering amount of $350,000.  In fact, as financial records Agravitae received over $2.5 million from investors before February 8, 2021.

51.     Agravitae and Owen knew or were reckless in not knowing that the statements contained in the 2021 Form D were materially false or misleading, and/or that they contained material omissions.

**The Illicit Brokerage Activities**

52.     As described above, to effectuate the TKO Farms and Agravitae securities offerings, Owen, directly or indirectly, recruited, engaged, and supervised multiple individuals–including Aguilar, Blaylock, Erskine, and Penhollow–to contact and solicit prospective investors to purchase TKO Farms and/or Agravitae securities.

53.     Once engaged by Owen, on behalf of TKO Farms and/or Agravitae, Aguilar, Blaylock, Erskine, and Penhollow, directly or indirectly, would notify Owen and/or his assistants of any investments that they were able to secure via their solicitation efforts.

54.      Owen, via TKO Farms and/or Agravitae, then paid Aguilar, Blaylock, Erskine, Penhollow, and other telephone solicitors commissions of up to 40% each of the funds raised from investors.

55.     Aguilar, Blaylock, Erskine, and Penhollow received, either directly or indirectly through the Relief Defendants, payments in at least the following amounts, which included commission payments:

//

//

//

//

//

//

//

| Defendant | Paid To | Date Range of Payments | Total Payments ($) |
|---|---|---|---|
| Aguilar | Reynaldo Aguilar | 02/22/19 – 04/17/20 | $81,750.00 |
| | Storber, LLC | 01/10/20 – 04/30/21 | $100,500.00 |
| Blaylock | James Blaylock | 01/02/18 – 06/14/19 | $121,415.54 |
| | FreeLife Logistics LLC | 01/02/18 – 02/28/20 | $292,198.00 |
| Erskine | Personal Group, LLC | 01/16/19 – 01/07/21 | $212,972.00 |
| | Signature One Capital Inc | 05/12/17 – 01/07/21 | $193,416.80 |
| Penhollow | Gilbert Penhollow | 07/14/17 – 05/18/21 | $133,015.64 |
| | Gianna Inc. | 07/06/18 – 09/04/20 | $1,282,107.05 |
| | Gladiator, Inc. | 10/16/20 – 04/09/21 | $345,870.91 |
| | Health Networking, Inc. | 01/22/21 – 03/05/21 | $45,187.04 |
| | Mega Marketing Inc. | 12/20/19 – 05/08/20 | $555,412.00 |
| | | **Total** | **$3,363,844.98** |

56.    None of Owen, Aguilar, Blaylock, Erskine, and Penhollow were, during the relevant time period, registered as a broker or dealer with the

Commission, nor associated with a broker or dealer registered with the Commission.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

### [15 U.S.C. § 77e(a); 77e(c)]

### (*All Defendants*)

57.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

58.    By engaging in the conduct described above each Defendant, directly or indirectly:

a.    made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell TKO Farms and/or Agravitae securities, as to which no registration statement was in effect, through the use or medium of any prospectus or otherwise;

b.    carried or caused to be carried through the mails or in interstate commerce, by any means or instrument of transportation, TKO Farms and/or Agravitae securities, as to which no registration statement was in effect, for the purpose of sale or for delivery after sale; and

c.    made use of any means or instruments of transportation or communications in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise TKO Farms and/or Agravitae securities as to which no registration statement had been filed.

59.    In regard to the sale of TKO Farms and Agravitae securities described herein, no exemption validly applied to the registration requirements described above.

60.     By reason of the foregoing, each of the Defendants violated and, unless enjoined, will (other than the Penhollow Estate) continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a); 77e(c)].

## SECOND CLAIM FOR RELIEF

### AIDING AND ABETTING

### Violations of Sections 5(a) and 5(c) of the Securities Act

### [15 U.S.C. § 77e(a); 77e(c)]

### (*Defendant Owen*)

61.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

62.     By engaging in the conduct described above, Defendants TKO Farms and Agravitae violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a); 77e(c)], and Defendant Owen, knowingly or recklessly, provided substantial assistance to Defendants TKO Farms and/or Agravitae in their respective achievements of said violations.

63.     Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Securities Act, or of any rule or regulation issued under the Securities Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

64.     By reason of the foregoing, and in the alternative to his direct violation of Sections 5(a) and 5(c) of the Securities Act, Defendant Owen is liable for violation of Sections 5(a) and 5(c) of the Securities Act to the same extent as Defendants TKO Farms and Agravitae are liable and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act.

### THIRD CLAIM FOR RELIEF

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

**(*Defendants Owen, Aguilar, Blaylock, Erskine, and Penhollow Estate*)**

65.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

66.     By engaging in the conduct described above, Defendants Owen, Aguilar, Blaylock, Erskine, and Penhollow each:

a.     engaged in the business of effecting transactions in securities for the account of others; and

b.     directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities without being registered as a broker or dealer with the Commission or associated with a broker or dealer registered with the Commission.

67.     By reason of the foregoing, Defendants Owen, Aguilar, Blaylock, Erskine, and Penhollow each violated and, unless enjoined, will (other than the Penhollow Estate) continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### FOURTH CLAIM FOR RELIEF
### AIDING AND ABETTING

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]**

**(*Defendants TKO Farms, Agravitae, and Owen*)**

68.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

69.     By engaging in the conduct described above, Defendants Aguilar, Blaylock, Erskine, and/or Penhollow violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], and Defendants TKO Farms, Agravitae, and Owen,

knowingly or recklessly, provided substantial assistance to Defendants Aguilar, Blaylock, Erskine, and/or Penhollow in their respective achievement of said violations.

70.   Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Exchange Act, or of any rule or regulation issued under the Exchange Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

71.   By reason of the foregoing, Defendants TKO Farms and Agravitae are liable for violations of Section 15(a)(1) of the Exchange Act to the same extent as Defendants Aguilar, Blaylock, Erskine, and Penhollow are liable and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act.

72.   By reason of the foregoing, and in the alternative to his direct violation of Section 15(a)(1) of the Exchange Act, Defendant Owen is liable for violation of Section 15(a)(1) of the Exchange Act to the same extent as Defendants Aguilar, Blaylock, Erskine, and Penhollow are liable and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act.

## **FIFTH CLAIM FOR RELIEF**

### **Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**
### (*Defendants TKO Farms, Agravitae, and Owen*)

73.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

74.   By engaging in the conduct described above, each of Defendants TKO Farms, Agravitae, and Owen, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

a.   employed devices, schemes, or artifices to defraud;

b.      obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.      engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

75.     With respect to violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)], each of Defendants TKO Farms, Agravitae, and Owen engaged in the above-referenced conduct knowingly or with severe recklessness.

76.     With respect to violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act  [15 U.S.C. §§ 77q(a)(2); 77q(a)(3)], each of Defendants TKO Farms, Agravitae, and Owen was at least negligent in its/his conduct and in the untrue and misleading statements alleged herein.

77.     By reason of the foregoing, Defendants TKO Farms, Agravitae, and Owen each violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

## SIXTH CLAIM FOR RELIEF
### AIDING AND ABETTING
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### (*Defendant Owen*)

78.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

79.     By engaging in the conduct described above, Defendants TKO Farms and Agravitae violated Section 17(a) of the Securties Act [15 U.S.C. § 77q(a)], and Defendant Owen, knowingly or recklessly, provided substantial assistance to Defendants TKO Farms and Agravitae in their respective achievements of said violations.

80.     Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Securities Act, or of any rule or regulation issued under the Securities Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

81.     By reason of the foregoing, and in the alternative to his direct violation of Section 17(a) of the Securities Act, Defendant Owen is liable for violations of Section 17(a) of the Securities Act to the same extent as Defendants TKO Farms and Agravitae are liable and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

## SEVENTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5]**

**(*Defendants TKO Farms, Agravitae, and Owen*)**

82.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

83.     By engaging in the conduct described above, each of Defendants TKO Farms, Agravitae, and Owen directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails,

a.     employed devices, schemes, and artifices to defraud;

b.     made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.     engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

84.     Each of Defendants TKO Farms, Agravitae, and Owen engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

85.     By reason of the foregoing, each of Defendants TKO Farms, Agravitae, and Owen have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

## EIGHTH CLAIM FOR RELIEF

### CONTROL PERSON

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5]

### (*Defendant Owen*)

86.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

87.     By engaging in the conduct described above, Defendants TKO Farms and Agravitae violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5].

88.     At all relevant times during which the violations occurred, Defendant Owen (a) controlled Defendants TKO Farms and Agravitae, (b) did not act in good faith, and (c) directly or indirectly induced the acts by Defendants TKO Farms and Agravitae that constituted the violation or cause of action.

89.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], every person who, directly or indirectly, controls any person liable under the Exchange Act or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Plaintiff Commission),

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

90.     By reason of the foregoing, Defendant Owen is liable, jointly and severally, for violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5 to the same extent as Defendants TKO Farms and Agravitae are liable and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5.

## NINTH CLAIM FOR RELIEF

### AIDING AND ABETTING

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5]**

**(*Against Defendant Owen*)**

91.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-56, inclusive, as if they were fully set forth herein.

92.     By engaging in the conduct described above, Defendants TKO Farms and Agravitae violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5], and Defendant Owen, knowingly or recklessly, provided substantial assistance to Defendants TKO Farms and Agravitae in their respective achievement of said violations.

93.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of the Exchange Act, or of any rule or regulation issued under the Exchange Act, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

94.     By reason of the foregoing, and in the alternative to his direct violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5, Defendant Owen is liable for violations of Section 10(b) of the Exchange Act and

Exchange Act Rule 10b–5 to the same extent as Defendants TKO Farms and Agravitae are liable and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act and Exchange Act Rule 10b–5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining each Defendant (other than the Penhollow Estate) from, directly or indirectly, engaging in conduct in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a); 77e(c)];

### II.

Permanently restraining and enjoining each Defendant (other than the Penhollow Estate) from, directly or indirectly, engaging in conduct in violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)];

### III.

Permanently restraining and enjoining each of Defendants TKO Farms, Agravitae, and Owen from, directly or indirectly, engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining each of Defendants TKO Farms, Agravitae, and Owen from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b–5 [17 C.F.R. § 240.10b–5];

### V.

Permanently restraining and enjoining each of Defendants Owen, Aguilar, Blaylock, and Erskine from, directly or indirectly, including, but not limited to,

through any entity owned or controlled by each, soliciting any person or entity to purchase or sell any security;

## VI.

Permanently restraining and enjoining Defendant Owen from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendant Owen, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant Owen from purchasing or selling securities for his own personal account through a Commission-registered broker-dealer;

## VII.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], unconditionally and permanently prohibit Defendant Owen from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15o(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## VIII.

Ordering each Defendant and each Relief Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## IX.

Ordering each Defendant (other than the Penhollow estate) to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## X.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry

out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## XI.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:  May 6, 2022


/s/ Tracy S. Combs
Tracy S. Combs
Casey R. Fronk
Charles E. Canter
*Attorneys for Plaintiff*
*Securities and Exchange Commission*